**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JUNE 18, 2008

JOE HERMAN, SUE HERMAN, JAY
JOLLAY, SARAH JOLLAY, JERRY
JOLLAY, NEAL KREITNER, TONY
PETERSON, LIZ PETERSON, RANDY
BJORGE, ANNETTE BJORGE, and TINA
BUCK,

    Plaintiffs-Appellants,

v                                                    No. 134097

COUNTY OF BERRIEN,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

This case involves further analysis of the issue presented in *Pittsfield Charter Twp v Washtenaw Co*, 468 Mich 702; 664 NW2d 193 (2003), in which we held that the county commissioners act (CCA)[1] has priority over the Township Zoning Act (TZA).[2] Today we are asked to gauge the scope of that priority, which relates to a

_____

[1] MCL 46.1 *et seq.*

[2] MCL 125.271 *et seq.* The TZA has since been replaced with the Michigan Zoning Enabling Act (MZEA) MCL 125.3101 *et seq.*, but that new act expressly

(. . . continued)

county's power to "site" and "erect" "building(s)," by defining the CCA's term "site." In defining that term, we hold that land uses that are ancillary to the county building and not indispensable to its normal use are not covered by the CCA's grant of priority over local regulations. Therefore, in this particular case, Berrien County's outdoor shooting ranges do not have priority over the township ordinances that plaintiffs rely on because they are land uses that are not indispensable to the normal use of the county building. Accordingly, we reverse the decision of the Court of Appeals and remand this case to the circuit court for further proceedings consistent with this decision.

## I. FACTS AND PROCEDURE

This case involves a piece of property that is located in Berrien County and Coloma Township. The property consists of a 14-acre parcel of land. The property is controlled by defendant, Berrien County, under a 20-year lease from a party that is unrelated to this case. The county entered into the lease in March 2005. The county leased the property with the intention of using it for a firearms training facility, which various law enforcement agencies would use for training exercises. Accordingly, in May 2005, the county contracted with DLZ Michigan, Inc., to design a master plan and conduct a feasibility study for the proposed facility. This master plan included constructing a building of more than 3,000 square feet at the center of the parcel to serve as a training and support building. This building would have a parking lot with

(continued . . )
provides that all claims, such as the one at bar, that were pending when the Legislature replaced the TZA with the MZEA are subject to the TZA.

2

24 standard parking spaces (and three handicapped spaces), multiple outdoor light poles, and a driveway. The facility would also have numerous outdoor shooting ranges. The ranges were to be set up like the spokes of a wheel that require the shooter to fire out from the center of the parcel. The center of the parcel is where the building would be located. See aerial photograph *infra* at note 4. The county initially planned on building the ranges first and erecting the building later.[3] During

---

[3] The feasibility study's executive summary contains the following description of the project:

> The Master Plan . . . will be implemented in two phases. Phase One involves the development of the practice facility itself . . . . A new building for training and support will be established later as funding becomes available. . . . DLZ also analyzed the cost of and benefits of constructing an indoor range. A single indoor range would cost an estimated $1.3 million to construct [compared to the $591,556 for the outdoor range] and would not eliminate the need for an outdoor firing range(s).

At oral argument, the county argued that the building was actually erected before the shooting ranges were constructed. We have found no support for this contention or the opposite contention. Nonetheless, the sequence of construction is not dispositive to our analysis. However, it is worth noting that the initial plans for the facility clearly indicate that the shooting ranges were the first and most prominent aspect of the facility to be constructed.

the course of this litigation, construction of both the shooting ranges and the building was started and is now completed.[4]

Operation of the county's shooting ranges would contravene several local ordinances. First, under the township's zoning ordinance, the shooting ranges are not a permitted land use given the property's current zoning status (primary agricultural). Additionally, gun clubs are not permitted in this zoning status unless the Coloma Charter Township Board has issued a special land use permit, which the county has

---

[4]



not received. Finally, the gun ranges produce noise levels that purportedly exceed the township's anti-noise ordinance.[5]

The shooting range facility has been the topic of a hotly contested public debate. Its supporters note that it provides an invaluable public service by simulating real-life conditions that law enforcement officers encounter in the field, preparing them to better serve the citizenry. Further, the supporters argue that indoor shooting ranges are simply inadequate to properly mimic field conditions. Opponents of the shooting ranges raised myriad concerns relating to the proximity of the ranges to other civilian land uses:

(1) Annually, 221,000 rounds will be fired.

(2) Automatic guns, semi-automatic guns, handguns, shotguns, and rifles are used. One type of gun used, the .308 caliber rifle, can fire a bullet 2.4 miles.

(3) The ranges all point outward from the property's center, toward the surrounding privately owned parcels.

(4) There are children's sports fields within one mile of the ranges.

(5) The ranges are within 2.4 miles of the Coloma schools and within one mile of over 50 homes.

---

[5] The parties have not litigated the merits of whether the shooting ranges violate the anti-noise ordinance because, up to this point, the main dispute hinged on whether the shooting ranges were immune from this ordinance. Nonetheless, the county's own feasibility study predicted that the gun range would produce noise levels above 87 decibels extending to approximately 370 of the surrounding acres. This apparently violates the anti-noise ordinance, which prohibits noise levels above 65 decibels between 7:00 a.m. and 10:00 p.m. and 55 decibels at all other times.

(6) Seasonally, up to 200 farm workers and their children are within range of the .308 rifle, and four migrant-worker residences are within 1,500 feet.

(7) The sheriff estimates that 25 percent of the training events will be conducted after dark.

(8) Property values within one mile of the range are estimated to have declined by an aggregate of $2.5 million; real estate agents report difficulty selling homes in close proximity to the facility.

Apparently having been persuaded by the local residents' concerns, in October 2005, the Coloma Charter Township Board voted unanimously not to support the facility. However, in November 2005, the county approved the facility, and construction on it proceeded.

Plaintiffs are a group of individuals who own property located in close proximity to the shooting ranges. In late November 2005, plaintiffs filed a declaratory judgment action that aimed to stop operation of the facility. The complaint alleged that the county's facility was prohibited by the township's zoning ordinance; and the plaintiffs' amended complaint additionally alleged that the facility violated the township's anti-noise ordinance. After various circuit court proceedings, the parties filed cross-motions for summary disposition. The trial court, relying on *Pittsfield*, *supra*, simultaneously granted the county's motion for summary disposition and denied plaintiffs' dispositive motion. Plaintiffs appealed, and the Court of Appeals affirmed in a published, split decision. *Herman v Berrien Co*, 275 Mich App 382; 739 NW2d 635 (2007). The Court of Appeals majority also relied on

6

*Pittsfield*, holding that the county is exempt from the township's regulations because they conflict with its express legislative authorization to site county buildings, which includes the county's shooting ranges. *Id.* at 384, 388-389. We granted plaintiffs' application for leave. *Herman v Berrien Co*, 480 Mich 961 (2007).

## II. STANDARD OF REVIEW

The case involves interpretation of the CCA. "Questions of statutory interpretation are questions of law, which will be reviewed de novo." *In re MCI Telecom Complaint*, 460 Mich 396, 413; 596 NW2d 164 (1999); see also *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).

## III. ANALYSIS

We are again called on to analyze a purported conflict between the powers given to intermediate government entities and the powers given to local government entities. Specifically, this case involves the relationship between a county's power, under the CCA, to site county buildings and the powers given to local governments under the TZA and the Township Ordinance Act, MCL 41.181 *et seq.*[6]

While this particular case includes novel nuances, the broad question is one that we have previously encountered. In *Dearden v Detroit*, 403 Mich 257; 269 NW2d 139 (1978), we analyzed a conflict between the Michigan Department of

---

[6] The relevant anti-noise ordinance was promulgated by Coloma Township pursuant to the Township Ordinance Act, § 1, which gives local governments the power to "adopt ordinances regulating the public health, safety, and general welfare of persons and property . . . ." MCL 41.181(1).

Corrections, in its attempts to use a building as a criminal rehabilitation center, and the city of Detroit's zoning ordinance, which precluded such land use. At that time, we acknowledged that "[n]o Michigan case has resolved, with finality, the question of whether our state or its agencies are inherently immune from local zoning ordinances." *Id.* at 262. Yet, we held that "the legislative intent, where it can be discerned, is the test for determining whether a governmental unit is immune from the provisions of local zoning ordinances." *Id.* at 264.[7] The holding in *Dearden* continues to be the appropriate test for these particular conflict cases.

In *Northville Charter Twp v Northville Pub Schools*, 469 Mich 285; 666 NW2d 213 (2003), we examined whether the authority of the state superintendent of public instruction to control site plans of schools under the Revised School Code (RSC)[8] had priority over the restrictions of a local zoning ordinance. Relying on the rule in *Dearden*, we held that the state superintendent's decision to build and operate a school was immune from the local zoning regulations because the Legislature evinced its intent to give the superintendent such priority by stating that the superintendent had "'sole and exclusive jurisdiction over . . . site plans for those

---

[7] In *Dearden*, we held that the Department of Corrections' rehabilitation house was immune from Detroit's zoning ordinance because the Legislature had evidenced its intent to that effect in MCL 791.204 by giving the Department of Corrections "'*exclusive jurisdiction* over . . . penal institutions'" and by making that act "'*repeal all acts and parts of acts inconsistent with the provisions of this act.*'" *Id.* at 265-266, quoting MCL 791.204 (emphasis in original).

[8] MCL 380.1 *et seq.*

school buildings.'" *Northville*, *supra* at 290, 295, quoting MCL 380.1263(3)[9] (emphasis omitted). The opinion also pointed out that the Legislature need not use the exact phrase "sole and exclusive jurisdiction" to bestow priority; but, when that phrase is used, it signifies a grant of priority. *Id*. at 291-292. In *Northville*, we also wrestled with the scope of priority in defining the RSC's phrase "site plan." The plurality opinion held that the phrase extended the priority of the superintendent's power in locating and operating schools to "everything on the property, i.e., the entire project." *Id*. at 292.[10]

*Dearden* and *Northville* make it clear that whenever the legal question of priority is presented, it must be resolved by thorough analysis of the statute that

[9] This subsection, in pertinent part, states:

The superintendent of public instruction has sole and exclusive jurisdiction over the review and approval of plans and specifications for the construction, reconstruction, or remodeling of school buildings used for instructional or noninstructional school purposes and, subject to subsection (4), of site plans for those school buildings. [MCL 380.1263(3).]

[10] I concurred and wrote separately to note that the phrase "site plan" should be defined as a legal term of art that involves a broader meaning than simply "'what goes on within the site itself,'" as the plurality phrased it. *Northville*, *supra* at 299. However, my disagreement with the plurality opinion on that issue is not dispositive in the instant case because, under either definition of "site plan," priority applied to more than simply erecting a school building. Indeed, even under the plurality opinion's narrower definition, "site plan" applied to any land use on the property, which is dispositive in this case as it relates to the distinction between "site plan," as used in the RSC, and "site," as used in the CCA. See *infra*.

9

purportedly gives the government entity priority over local regulations.[11]   In this case, that statute that potentially gives the county priority over the township's ordinances is the CCA.  Thus, following *Dearden* and *Northville*, we must analyze the CCA to discern the Legislature's intent regarding any priority that that act may give to counties.[12]  The CCA states in pertinent part:

> A county board of commissioners, at a lawfully held meeting, may do 1 or more of the following:
>
> (a) Purchase or lease for a term not to exceed 20 years, real estate necessary for the site of a courthouse, jail, clerk's office, or other county building in that county.
>
> (b) Determine the site of, remove, or designate a new site for a county building.   The exercise of the authority granted by this subdivision is subject to any requirement of law that the building be located at the county seat.

***

---

[11] In this context, the term "priority" is legally synonymous with the term "immunity," because if a government entity has priority over local regulations, it may also be described as being immune from local regulations.  This comports with the semantics of traditional preemption analyses, which these conflict-of-laws cases involve.

[12] The Court of Appeals and both parties include *Burt Twp v Dep't of Natural Resources*, 459 Mich 659; 593 NW2d 534 (1999), in their analyses of the priority issue because that case dealt with whether a statute gave the Department of Natural Resources priority over a local zoning ordinance.   However, we find *Burt* distinguishable from the instant "priority" analysis for several reasons.  First, *Burt* is only helpful regarding the general precepts of the priority analysis because it was applying a different power-granting statute, and it did not expand on the general guidance *Dearden* had already given.  Second, any general aid to the priority analysis that *Burt* may have given is inapplicable because, since *Burt*, *Pittsfield* has decided the instant priority question of the CCA versus local regulations.   Finally, *Burt* simply did not evaluate the scope of any statutory priority, which is the pivotal issue here.

(d) Erect the necessary buildings for jails, clerks' offices, and other county buildings, and prescribe the time and manner of erecting them. [MCL 46.11.]

This is not the first time we have conducted a priority analysis of the CCA. Indeed, we first applied *Dearden*'s rule to the CCA in *Pittsfield*, a case in which a township wanted to stop Washtenaw County from constructing a homeless shelter because the shelter violated the township's zoning ordinance. We held that under the CCA, the county's authority to site and erect county buildings superseded the township's authority under its zoning ordinance. *Pittsfield*, *supra* at 710-712. We reasoned that if a county were required to follow local use regulations, the CCA's grant of power to site and erect county buildings would be effectively "surplusage." *Id*. at 713-714. Thus, since *Pittsfield*, it has become accepted that the CCA gives counties priority over local regulations that inhibit a county's power to site and erect county buildings under the CCA.[13]

In this case, we are not asked to disturb *Pittsfield*'s holding; both parties and both lower courts accept *Pittsfield* as controlling. Yet, *Pittsfield* does not answer the question presented here because that case did not examine the scope of priority that the CCA gives counties. That scope question is the pivotal issue in this case. In other

---

[13] While *Pittsfield*'s holding may have been interpreted as only applying to the CCA's priority over local zoning restrictions, today we extend that holding to include the uncontroversial notion that the CCA grants counties similar priority over any local ordinance that would apply to restrict the county's power to site and erect county buildings in the same fashion that the zoning ordinance inhibited the homeless shelter in *Pittsfield*.

words, while there is no dispute in this case regarding whether the CCA gives the county priority to site and erect county buildings, there is a dispute regarding whether that priority extends to the county's land uses—the shooting ranges—that are ancillary to its buildings. In that regard, the Court of Appeals majority correctly noted that the true issue is the definition of the CCA's term "site." Indeed, it is this definitional analysis that will answer the true question in this case: When a county erects a building pursuant to its authority under the CCA, what land uses, if any, are encompassed in the definition of "site" such that they also have priority over local regulations? Thus, as that question applies to this case, if building the outdoor shooting ranges is included in the county's power to "site" buildings, those land uses will have priority over the township's ordinance; whereas, if they are not included in the definition of "site," they will not have priority.

On that issue, the Court of Appeals stated:

> "Site" is not defined in the statute, so resorting to a dictionary is necessary to determine the ordinary meaning of the word. *Northville* [*supra at* 292]. In *Northville* . . . the Supreme Court looked to the dictionary to define "site" when determining the meaning of "site plan" under the [RSC]:

> "This leaves to be determined the definition of 'site plan.' The dictionary defines 'site' as 'The place where something was, is, or is to be located,' *The American Heritage Dictionary of the English Language* (1982), or similarly, "[T]he area or exact plot of ground on which anything is, has been, or is to be located . . . ." *Random House Webster's College Dictionary* (1997). [*Id.*]"

> Using these same definitions, it is clear that when designating a new "site" for county buildings, the "site" includes the entire area of ground on which the building is to be located. In other words, it is the "site" or, in real terms, the entire parcel where the buildings will be located, that is not subject to local regulation. Hence, the uses on the site of the

building are not subject to the township's ordinances. *Pittsfield Twp*, *supra* at 711. [*Herman, supra,* 275 Mich App at 386-387.]

The Court of Appeals used this analysis to hold that the county's shooting ranges had priority over the township's ordinances. We disagree with this conclusion and therefore reverse.

Initially, we note that the definition of "site" from *Northville* is not controlling because it derives from a different priority-giving statute. *Northville* involved the RSC, while the present case involves the CCA. In comparing these two statutes, it is clear that they serve different purposes and, accordingly, bestow different powers on their respective government entities.

The RSC gives the superintendent "sole and exclusive jurisdiction over the review and approval of plans and specifications for the construction, reconstruction, or remodeling of school buildings used for instructional or noninstructional school purposes and . . . of *site plans* for those school buildings." MCL 380.1263(3) (emphasis added). Hence, the RSC gives the superintendent unlimited authority over the entire site plan of school buildings. Also notably, the RSC defines one such building very broadly: "[a]s used in this section: 'High school building' means any structure or facility that is used for instructional purposes, that offers at least 1 of grades 9 to 12, and that includes an athletic field or facility." MCL 380.1263(8)(a).

In contrast, the CCA gives counties the power to "[d]etermine the site of, remove, or designate a new site for a *county building*," and to "[e]rect the necessary *buildings* for jails, clerks' offices, and other *county buildings* . . . ." MCL 46.11(b) and (d) (emphasis added). Thus, a county's power under the CCA is limited to the

13

siting of county buildings, which does not equate to the power to review and approve site plans. Further, that power is limited because it does not apply when that particular county building is required by law to "be located at the county seat." MCL 46.11(b).

In sum, the RSC gives nearly unlimited power ("sole and exclusive") regarding entire site plans of schools, whereas the CCA gives a power that is limited in certain circumstances and only applies to siting county buildings. Accordingly, the CCA's limited term "site" does not carry the same meaning as the RSC's expansive phrase "site plan." Thus, the Court of Appeals incorrectly relied on *Northville*, which dealt with the RSC, to equate "site plan" with "site" as used in the CCA.

However, simply noting that *Northville* does not adequately define "site" under the CCA does not complete our analysis. We must still give meaning to that term by adopting a test that determines whether and which land uses are encompassed in its definition. On that score, the County proffers that "site" applies to any use of land that is reasonably connected to the county building thereon. Plaintiffs do not suggest an alternative test. Instead they rely on the CCA's limited grant of authority to site buildings, which, it argues, omits the power to site ancillary land uses. Neither party is wholly correct.

In this analysis, we are mindful of *Dearden*'s overarching maxim: "legislative intent, where it can be discerned, is the test for determining whether a governmental unit is immune from the provisions of local zoning ordinances." *Dearden, supra* at

14

264. We also note that, in statutory interpretation, if the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995). Also, "[a]s far as possible, effect should be given to every phrase, clause, and word in the statute. The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999) (internal citations omitted). Finally, in defining particular words in statutes, we must "consider both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'" *Id.*, quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

The CCA is an unambiguous statute. In pertinent part, it gives counties the power to "[d]etermine the site of, remove, or designate a new site for a county building" and to "[e]rect the necessary buildings for jails, clerks' offices, and other county buildings . . . ." MCL 46.11(b) and (d). A plain reading of this language leads to the conclusion that the Legislature intended to give counties the power to "site" and "erect" "county buildings." Each time the CCA grants the power to site, it invariably relates that power to "buildings." Notably, the Legislature never semantically links the power to site with any nonbuilding activity or land use. In other words, the CCA does not give counties the power to site a county "activity" or county "land use"; rather, it always relates its grant of siting power to "buildings." This leads to the

15

conclusion that the siting power is limited to buildings.[14]   This conclusion is supported by the contextually derived purpose of the CCA.  The CCA was expressly promulgated "to define the powers and duties of the county boards of commissioners . . . ."  Title of 1851 PA 156, as amended by 1978 PA 51.  Accordingly, in § 11, the act clearly and descriptively articulates the numerous powers it gives to counties.[15]  The power to site county activities or land uses is conspicuously absent from that list.[16]  Also, the CCA's continued use of the term "building(s)" must have significance.  That term would be rendered nugatory if the CCA's power to "site" was meant to extend to other county acts, such as siting land uses, because those other acts are never listed in the CCA.  In essence, if those unlisted acts were actually included in the power to site buildings, then the CCA's express inclusion of the power to site buildings would be superfluous.   This cannot be.[17]  Therefore, the CCA's continued use of the term

---

[14] In fact, the CCA expressly includes examples that uniquely fit into the category of buildings: courthouses, jails, clerks' offices, and other county buildings.

[15] In addition to the siting power, the CCA also gives counties the power, among other things, to: "[p]urchase or lease . . . real estate," "[b]orrow or raise by tax upon the county those funds authorized by law," "[e]stablish rules consistent with the open meetings act," and "[g]rant or loan funds to a nonprofit corporation organized for the purpose of providing loans for private sector economic development initiatives."  MCL 46.11 (a), (e), (p), and (r).

[16] In light of the array of disparate powers enumerated in the CCA, the Legislature surely could have, for instance, granted counties the power to site land uses, such as landfills, reservoirs, beaches, parks, or other county land uses.  But it chose not to.

[17] See *Altman v Meridian Twp*, 439 Mich 623, 635; 487 NW2d 155 (1992) (when interpreting a statute, no word should be treated as surplusage or rendered nugatory if at all possible).

"building(s)" must place significant limitations on the meaning of the act's term "site" by omitting the power to do other acts.

However, we are mindful that the power to site a building is worthless if the entity that sites the building cannot make normal use of the building. Just as *Pittsfield* recognized that the power to site a building would be "mere surplusage" if the siting entity had to comply with zoning ordinances, *Pittsfield*, *supra* at 713, we too acknowledge that the power to site a building would be meaningless if the siting entity could not conduct ancillary land uses in order to make normal use of the building. For instance, the normal use of most county buildings would require sidewalks, parking lots, and light poles. Thus, while defining the power to "site" as being limited to buildings, we simultaneously accept that some ancillary land uses must be included in the county's siting power.

Next, we must articulate a standard to test whether a particular ancillary land use is encompassed in the use of the building such that it is given priority under the CCA. To answer that question, a court must ask whether the ancillary land use is indispensable to the building's normal use. "The TZA vests townships with broad authority to enact zoning ordinances to regulate land development and to 'insure that the use of land shall be situated in appropriate locations and relationships . . . .'" *Pittsfield*, *supra* at 707-708, quoting MCL 125.271(1). As stated, the priority given to the county in MCL 46.11(b) and (d) is significantly limited to siting a building. Because the county's authority is limited, the encroachment on a township's broad authority must be limited to that needed to effect the purpose of §§ 11(b) and (d).

17

Thus, we hold that the scope of the CCA's priority over the TZA is limited to ancillary land uses that are indispensable to the building's normal use. Accordingly, the ancillary land use will only have priority over local regulations if it is indispensable to the building's normal use.[18] This standard will invariably require a case-by-case analysis in future applications.

Turning to the present case, the ancillary land use in question is the outdoor shooting ranges on the county's leased property. Using the "indispensable" test, we must decide if that ancillary land use has priority over the township's zoning and anti-noise ordinances. In order to decide if this ancillary land use is indispensable to the normal use of the county's building, we must define the normal use of the county's building. The county's building is located in a complex that is called the "Berrien

---

[18] In adopting this standard, we are reminded of, and guided by, the venerable holding in *McCulloch v Maryland*, 17 US (4 Wheat) 316; 4 L Ed 579 (1819), in which the United States Supreme Court dealt with a similar issue regarding the scope of a government's power when its granting authority leaves that question unanswered. The Court stated:

> Congress is not empowered by it to make all laws, which may have relation to the powers confered on the government, but such only as may be "*necessary and proper*" for carrying them into execution. The word "*necessary*" is considered as controlling the whole sentence, and as limiting the right to pass laws for the execution of the granted powers, to such as are indispensable, and without which the power would be nugatory. [*Id.* at 413.]

While the CCA does not contain the exact phrase "necessary and proper," we find the present issue strikingly similar. The CCA has given power to this state's counties, and that power must be useable, yet limited. Thus, with no statutory direction in that regard, we find the *McCulloch* Court's resolution of its similar dilemma compelling.

18

County Sheriff's Department Firearms Training Facility." The county's feasibility study for the facility describes the purpose of the building as being "for training and support."[19] Thus, the building's normal use is for firearms training and support. More specifically, the building's normal use is for conducting classroom firearms training. While it may be true that this normal use works in concert with, or aids, the broader purpose of total firearms training, which includes using outdoor shooting ranges, the normal use of the building is to conduct classroom (or *indoor*) training, which is different from the outdoor firearms training that occurs in the shooting ranges. This distinction is of great import when recalling that the CCA's grant of power hinges on siting and erecting "buildings." In other words, a county may not expand a building's normal use simply because that building's use aids or complements another distinct use. For purposes of CCA priority, a building's normal use only extends to the actual uses of that particular building because, again, that is the extent of the power granted to the county by the CCA. Therefore, despite the county's use of the building to support the broad arena of firearms training, which conceivably includes the outdoor shooting ranges, the building's normal use is limited to conducting indoor "training and support." In other words, the normal use of the outdoor shooting ranges is for outdoor shooting practice and training, while the

---

[19] Both parties have accepted the factual assertions of this study. In fact, the county proffered an affidavit of the chairman of the Berrien County Board of Commissioners, in which the chairman expressly adopts the study's findings. The county also presented the affidavit of a county undersheriff, who stated that "[t]he training facility building will function as a classroom. This is because virtually all firearms training begins in a classroom setting."

normal use of the building is for indoor classroom training and practice, despite both uses falling under the broad category of firearms training.

Accordingly, the final question is whether the outdoor shooting ranges are indispensable for the building's indoor training and support. We hold that they are not indispensable because the indoor training and support can be conducted without the outdoor shooting ranges being located next to the building. Therefore, under the CCA, the shooting ranges are not given priority over the township's ordinances.

## IV. CONCLUSION

The county's shooting ranges do not have priority over the township's ordinances because those local regulations do not conflict with the county's powers under the CCA; as they apply to the shooting ranges, the regulations do not stop the county from exercising its limited power to site buildings. However, the county building, its parking lot, its driveway, and its lighting poles do have priority over the local regulations because they are indispensable to the normal use of the building.

Accordingly, we reverse the judgment of the Court of Appeals and remand the case to the circuit court for further proceedings consistent with this opinion. We do not retain jurisdiction.

Michael F. Cavanagh
Clifford W. Taylor
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

20