HATHAWAY, J.
(dissenting). This case addresses whether a medical procedure performed on plaintiff to treat his severe accident-related spinal-cord injuries was “reasonably necessary” under MCL 500.3107(1)(a) of the no-fault act, MCL 500.3101 et seq. The majority holds that the procedure was not “reasonably necessary” and, in doing so, adds language to the no-fault act that was rejected by ballot referendum in 1994. The majority reaches its result by erroneously removing the determination of which expenses are “reasonably necessary” from the jury. Additionally, the majority’s new judicially crafted definition of “reasonably necessary” elevates the standard for proving that treatment is “reasonably necessary” to one that is more stringent than MCL 500.3107(1)(a) requires. I respectfully dissent because today’s decision erroneously changes the mandates of the no-fault act and replaces them with standards that are inconsistent with the language and history of that act. I would apply the statute as written and uphold the jury’s finding that the procedure performed on plaintiff was “reasonably necessary.” Therefore, I would reverse the Court of Appeals’ judgment and hold that plaintiff is entitled to reimbursement of the costs associated with the procedure.
*180 This case involves plaintiffs request that his no-fault insurer, defendant Home-Owners Insurance Company, reimburse him for the expenses surrounding an experimental procedure that he underwent in Portugal. The procedure was performed to treat the serious spinal-cord injuries plaintiff had sustained in a motorcycle accident. The accident left plaintiff a paraplegic with no sensation in or control of his lower body, leaving him confined to a wheelchair and in need of assistance in urinating and defecating. His condition showed no improvement during the four years between his accident and the procedure. According to plaintiffs expert witness, plaintiffs condition improved following the procedure. However, defendant refused to pay for the procedure, arguing that it was not “reasonably necessary” for plaintiffs “care, recovery, or rehabilitation”[1] because it was experimental in nature.
During his jury trial, plaintiff presented testimony from Dr. Carlos Lima, a neurologist on the surgical team that performed the procedure. Dr. Lima testified that the procedure involved harvesting tissue containing stem cells from plaintiffs own sinus cavities and transplanting the tissue into the injured area of the spinal cord. Dr. Lima testified that this procedure fosters growth of new cells in the injured spinal cord, while avoiding the ethical and technical issues surrounding the use of embryonic stem cells. Although the procedure had not been presented for approval by the federal Food and Drug Administration (FDA), Dr. Lima testified that it was conducted within the standards of the European Commission’s guidelines regarding clinical procedures. The procedure was performed in a governmental hospital in Lisbon, Portugal, after the presiding physician had obtained approval from the hospital board. Dr. Lima testified that of the 110 patients who *181 had undergone the treatment in his program, a majority of the patients showed improvement. Dr. Lima’s testimony describing the success of the procedure included the following:
Q. Have you had patients who have undergone this stem cell surgery recover their ability to walk?
A. Not unassisted, but we have — and this is rule [sic] now for our patients to be walking assisted with a walker. That’s the rule now for our patients.
Q. Have some of your patients recovered movement below the injury site after this surgery?
A. Yes.
Q. Have some of the patients shown improvement in sensation below the injury site?
A. Yes.
Q. Overall, would you describe — how would you describe the degree of success of the surgeries on patients?
A. Well, maybe I’m not right person to say that, and that’s why we want to publish the whole results of the patient, but I would say the majority of patients have some kind of improvement.
Plaintiffs treating doctor in the United States, Dr. Steven Hinderer, also testified concerning the reasonableness of the procedure, and responded to questioning as follows:
Q. And based on everything you know about this surgery and in light of [plaintiffs] injury and with your experience with all the other patients that have undergone this surgery, did you consider it a reasonable form of treatment for [plaintiff] to have this surgery if his objective was to try to increase his recovery below the injury site?
A. Yes.
*182 The jury found that the expenses related to the surgery in Portugal were reasonable charges for reasonably necessary products, services, and accommodations for plaintiffs care, recovery, and rehabilitation under the no-fault act. The Court of Appeals, however, reversed the jury’s finding and ordered the trial court to enter a judgment in defendant’s favor.[2] Plaintiff now appeals that decision.
The issue before this Court is whether an experimental medical procedure can be “reasonably necessary” for an injured person’s care, recovery, or rehabilitation.[3] Deciding this issue requires application of MCL 500.3107(1)(a).
When interpreting a statute, we follow the established rules of statutory construction. The purpose of statutory construction is to discern and give effect to *183 the intent of the Legislature.[4] In doing so, we first look to the actual language of the statute.[5] If a statute is clear and unambiguous, it must be enforced as written and no further judicial construction is allowed.[6] Simply stated, we must avoid a construction that would render any part of the statute nugatory,[7] and similarly, we are “not free to add language to a statute or to interpret a statute on the basis of this Court’s own sense of how the statute should have been written.”[8] Further, a statute must be read as a whole,[9] and while individual words and phrases are important, the words and phrases should be read in the context of the entire legislative scheme.[10] And “when courts interpret the no-fault act in particular, they are to remember that the act is remedial in nature and must be liberally construed in favor of the persons intended to benefit from it.”[11]
The statute at issue, MCL 500.3107(1), provides in pertinent part:
(1) Except as provided in subsection (2), personal protection insurance benefits are payable for the following:
(a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, ser *184 vices and accommodations for an injured person’s care, recovery, or rehabilitation. Allowable expenses within personal protection insurance coverage shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations except if the injured person requires special or intensive care, or for funeral and burial expenses in the amount set forth in the policy which shall not be less than $1,750.00 or more than $5,000.00.
The majority holds that in order for an expense related to an experimental surgical procedure to be “reasonably necessary,” a court must first determine as a matter of law that there is “objective and verifiable medical evidence establishing that [the experimental surgical procedure] is efficacious.”[12] Further, the majority holds that plaintiff did not meet the “objective and verifiable medical evidence” standard because Dr. Lima’s research “was unsupported by any controlled studies, it was not subject to peer review, and the medical evidence was not debated in scholarly publications.”[13] Thus, the majority’s new standards add language to the statute that is simply not there.
In this case, there was testimony from two doctors who assessed plaintiffs condition before the procedure was performed. Dr. Lima testified that it would be necessary for plaintiff to undergo the procedure in order to have a chance at recovery. Dr. Hinderer did state that he was not able to recommend the procedure to plaintiff because the procedure was not an authorized procedure in the United States, but he also testified that the procedure was a reasonable form of treatment for plaintiff. The majority characterizes Dr. Hinderer’s testimony as casting doubt on the efficacy of the procedure because “Dr. Hinderer did not endorse, *185 recommend, or prescribe the procedure to plaintiff.”[14] This characterization is erroneous.
The majority dismisses the fact that the facility where plaintiff was treated by Dr. Hinderer, the Rehabilitation Institute of Michigan, has a professional relationship with Dr. Lima’s program in Portugal pursuant to which the Rehabilitation Institute screens patients to determine whether they meet the criteria to be eligible for the procedure. Dr. Lima’s program has performed the procedure on 110 patients from around the world. According to Dr. Lima, the Rehabilitation Institute has screened nearly 60 patients for the procedure. Of the 60 patients from the Rehabilitation Institute, 40 were Dr. Hinderer’s patients. Thus, I disagree with the majority’s assertion that Dr. Hinderer cast doubt on the efficacy of the procedure. More than a third of the patients in the worldwide program were patients of Dr. Hinderer, which, when viewed in a light most favorable to the plaintiff,[15] suggests that Dr. Hinderer does not doubt the effectiveness of the procedure. However, even if doubt was cast by one of the two assessing physicians, an issue of fact still existed for the jury to resolve under Owens v Auto Club Ins Ass’n, 444 Mich 314, 326; 506 NW2d 850 (1993).[16] Today’s decision erroneously holds that the jury should not have decided this genuine issue of material fact.
*186 The majority holds that the jury incorrectly concluded that the procedure was “reasonably necessary.” In reaching this result, the majority disregards much of the actual testimony presented.[17] For instance, Dr. Lima testified that without the procedure, “there’s no possibility for [plaintiff] to have any recovery with such [an injury] which is not just functionally complete, but it was anatomically very destructive and complete also.” Dr. Lima’s statement shows that a doctor who assessed plaintiff’s condition found that there was no possibility of recovery before the procedure.
The majority argues that Dr. Lima’s testimony suggests merely “the possibility or opportunity to recover” and that a “possibility . .. cannot be measured without objective evidence establishing efficacy in the first place.”[18] This argument is at odds with the actual language of MCL 500.3107(1)(a) because it contains standards not found in the language of the statute. The statute only requires a procedure to be “reasonably necessary” to qualify as an allowable expense. Therefore, the analysis should be limited to whether a procedure was “reasonably necessary” under the commonly understood meaning of those words.[19] The statute does *187 not contain any language limiting the basis of a “reasonably necessary” determination to objective and verifiable medical data, as is required by today’s decision.
The majority also errs because it misconstrues the meaning of the term “reasonably necessary.” Without any statutory support, it interprets the word “reasonably” to mean “objective and verifiable.” The majority then declares that the term “necessary” creates a strict standard requiring “evidence” of “efficacy.”[20] The evi *188 dence that the majority refers to can only be satisfied with thorough evidence from the “medical community.”[21] However, the statute before us does not contain the terms “objective,” “verifiable,” “evidence,” “efficacy,” or “medical community.”
Under the majority’s own stated principle, words cannot be read into this statute. In order to provide support for the majority’s new standard, the statute would have to contain, at a minimum, language indicating that expenses are only allowable if they relate to procedures that are “proven to be efficacious by the medical community or the FDA.” However, such language is not in the no-fault act. For all practical purposes, this is a “medically necessary” or “medically appropriate” standard, despite the majority’s statements to the contrary. Thus, today’s decision rewrites the statute to require that a procedure be “medically necessary” or “medically appropriate” in order for an insured to be reimbursed by his or her insurer.
*189 In response to this criticism, the majority proclaims that nowhere in its opinion does it use the phrases “medically necessary” or “medically appropriate,” except in its response to this dissent. But the majority need not invoke those magic words for it to be obvious to all that this is precisely what the majority’s new standard requires. A standard that requires the presentation of objective and verifiable medical evidence establishing that a treatment is generally efficacious, based on controlled studies subject to peer review or scholarly publications, is a “medically necessary” standard. The majority’s statements to the contrary do not change the practical reality of its new standard.
In reviewing the actual language of the statute, it is clear that the determination of whether a procedure is “reasonably necessary” involves analyzing whether the decision to undergo the procedure was within reason, in light of the testimony that plaintiff would not recover if he did nothing.[22] Moreover, it must not be forgotten that a jury of plaintiffs peers found that the procedure was “reasonably necessary” for plaintiffs “care, recovery, and rehabilitation.” By making this broad decision today, the majority has turned a procedure that was found to be “reasonably necessary” for plaintiffs “care, recovery, or rehabilitation” into an unreasonable choice. In this case, the majority effectively asserts that it was unreasonable as a matter of law for this plaintiff to have pursued the only procedure that could possibly prevent him from being a paraplegic for the rest of his life.
*190 Further, the majority states that “[t]he ultimate question whether the surgical procedure at issue here is a covered expense under the no-fault act does not turn on its status as experimental.”[23] However, despite this statement, experimental procedures and participation in research projects are effectively excluded from coverage as a matter of law under the majority’s new standard. The majority’s standard requires objective and verifiable medical evidence proving a procedure’s efficacy, but if such data were to exist, it is unclear how the procedure would still be termed “experimental” or in the “research” phase.
Despite the majority’s protestations to the contrary, its decision today also abandons well-established precedent. In Nasser v Auto Club Ins Ass’n, 435 Mich 33, 54; 457 NW2d 637 (1990), this Court stated that “the question of whether expenses are reasonable and reasonably necessary is generally one of fact for the jury” and that summary disposition should only be granted when the reasonableness and necessity of a procedure can be determined with “certainty” when the evidence is viewed in the light most favorable to the nonmoving party.[24] In Owens, 444 Mich at 326, this Court stated that the presentation of competing professional opinions from doctors who assessed the plaintiff was enough to create a question of fact regarding whether the *191 procedure was “reasonably necessary.” Rather than following existing precedent and holding that the determination of whether a procedure is “reasonably necessary” is one for the jury, the majority transforms this question into a question of law.
Today’s decision is particularly troubling given that, as recently as December 2010, a majority of this Court clarified a Court of Appeals remand order that had stated “ £[w]hether a cost constitutes an allowable expense is a question of law and so it is to be determined by the court, not the jury.’ ” Wilcox v State Farm Mut Auto Ins Co, 488 Mich 1011 (2010). This Court’s clarifying order instructed that
[a]lthough whether an expense constitutes an “allowable expense” under MCL 500.3107(1)(a) is generally a question of law for the court, Griffith v State Farm Mut Auto Ins Co, 472 Mich 521, 525-526; 697 NW2d 895 (2005), “the question whether expenses are reasonable and reasonably necessary is generally one of fact for the jury,” Nasser [435 Mich at 55]. Therefore, to the extent that there are material questions of fact pertaining to whether the expenses in this case are reasonable and reasonably necessary, these questions of fact must be decided by a jury. [Id. at 1011.]
In light of this Court’s recent decision in Wilcox, it is unclear why it is suddenly necessary to change the way that “reasonably necessary” is decided. How has this Court’s precedent become so unclear in such a short time? Why must this Court now effectively reverse the instructions in Wilcox and disregard Nasser?
Finally, perhaps the most significant evidence that the majority errs is that the Legislature enacted a bill *192 inserting language similar to that which the majority adds to the statute today, and the voters of this state rejected it by referendum. In 1993 PA 143, the Legislature amended the no-fault act, creating a standard to determine allowable expenses similar to the standard that the majority has adopted today.[25] MCL 500.3107(1), as amended by 1993 PA 143, stated:
(1) Except as provided in subsection (3), personal protection benefits are payable for the following:
(a) Allowable expenses that, for policies issued or renewed on after 120 days after the effective date of the amendatory act that added subsection (7), are as provided in subparagraphs (i) and (ii), incurred for medically appropriate products, services, and accommodations for an injured person’s care, recovery, or rehabilitation. For policies issued or renewed on or after 120 days after the effective date of the amendatory act that added subsection (7) and on forms approved by the commissioner, an insurer shall offer the following coverages and an insured shall select in writing 1 of the following coverages:
(i) Coverage for allowable expenses consisting of all reasonable charges incurred up to a maximum of $1,000,000.00 for medically appropriate products, services, and accommodations for an injured person’s care, recovery, or rehabilitation....
(ii) Coverage for allowable expenses consisting of all reasonable charges incurred up to $2,000,000.00, $3,000,000.00, $4,000,000.00, or $5,000,000.00 máximums as selected by the insured, and the insurer may offer additional coverage limits, for medically appropriate prod *193 ucts, services, and accommodations for an injured person’s care, recovery, or rehabilitation .... [Emphasis added.]
Additionally, MCL 500.3107(4), as added by 1993 PA 143, stated in pertinent part:
As used in this section:
(a) Medically appropriate products, services, and accommodations rendered or prescribed by a health care facility or health care provider are those that are medically necessary .... Under no circumstances shall an insurer be required to provide coverage for any product, service, or accommodation that is not medically appropriate and medically necessary for an injured person’s care, recovery, or rehabilitation and reasonably likely to provide continued effectiveness with respect to the injured person’s care, recovery, or rehabilitation.... Each insurer shall designate a person with whom providers can discuss insurer determinations of what is medically appropriate and medically necessary. Disputes over reasonable charges and medically appropriate and medically necessary products, services, and accommodations shall be a question of law to be decided by the court.
(c) Expenses within personal protection insurance coverage shall not include experimental treatment or participation in research projects. [Emphasis added.]
In November 1994, Proposal C asked the voters of this state to consider whether the amended requirements imposed by 1993 PA 143 embodied what the law of this state ought to be. In the referendum, Michigan voters overwhelmingly answered “No.”[26] Thus, the citizens of Michigan expressly rejected a “medically necessary or medically appropriate” standard, a requirement *194 that disputes be decided by courts as a question of law, and, most significantly, a prohibition against coverage for “experimental treatment or participation in research projects.”[27]
Despite the voters’ rejections of these three elements, today’s decision inserts them into the no-fault act. The majority argues that, because 1993 PA 143 attempted to broadly reform the no-fault system with numerous changes to MCL 500.3107, it is somehow unclear whether the voters actually rejected the specific reforms that the majority judicially enacts today.[28] This reasoning is misguided and illogical.
First, it is improper for this Court to insert elements of a rejected law into a statute because such action amounts to judicial engineering of a statute. The voters spoke on 1993 PA 143 in Proposal C, the Legislature has not chosen to subsequently add these three rejected elements into the no-fault act, and it is wrong for the majority to do so today. Most importantly, Const 1963, art 2, § 9 states that “[n]o law as to which the power of referendum properly has been invoked shall be effective *195 thereafter unless approved by a majority of the electors voting thereon at the next general election.”
Second, it is disingenuous to argue that there is no way to determine which specific element of the law the voters rejected. The voters rejected the entire law. Plain and simple, the voters said “No.” Thus, it borders on nonsensical for this Court to argue that the voters only disagreed with specific elements of the act and that we do not know which elements. A referendum vote, such as that taken on Proposal C, is an all-or-nothing vote, and, with respect to what voters wanted added to the no-fault act, the voters chose nothing.[29]
Moreover, the majority fails to recognize the unique importance of referenda. As Justice RILEY stated in In re Executive Message from the Governor, 444 Mich 1214 (1994):
In the State of Michigan, “[a]ll political power is inherent in the people. Government is instituted for their equal benefit, security and protection.” Const 1963, art 1, § 1. In accordance with this fundamental maxim of republican government, “[t]he people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum.” Const 1963, art 2, § 9. Such power is necessary to check the legislative branch of government when it either abuses its power or fails to heed the wishes of its constituency. See, e.g., Kuhn v Dep’t of Treasury, 384 Mich 378, 385 [183 NW2d 796] *196 (1971). The importance of the referendum is so vital that “[n]o law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.” Const 1963, art 2, § 9.
Thus, the majority’s decision today is in direct conflict with the will of the voters of this state.
The pertinent part of the statute only uses the phrase “reasonably necessary” and specifies that the procedure must be for the “injured person’s care, recovery, or rehabilitation.” As noted earlier, if there is any factual dispute about whether a treatment is “reasonably necessary,” that dispute must properly be decided by a jury. Rather than focusing on one factor, such as objective and verifiable medical evidence establishing the efficacy of the procedure, a determination by the jury could include an analysis of any number of factors. Such factors could include medical professionals’ conclusions regarding the reasonable necessity of a procedure, lay persons’ conclusions regarding the reasonable necessity of a procedure, scientific support for the effectiveness of a procedure, or possibly even the subjective belief of the plaintiff. The point, however, is that it is up to the jury, on a case-by-case basis, to decide what is reasonable or unreasonable. Michigan’s Constitution affords parties “[t]he right of trial by jury. . . .”[30] This Court should not disregard the important fact-finding role of the jury. This Court must respect the no-fault act as it is currently written.
CONCLUSION
Today’s decision rewrites the requirements for an insurer to pay allowable expenses under MCL 500.3107 *197 of Michigan’s no-fault act. The majority holds that the procedure in this case was not “reasonably necessary” and, in doing so, adds language to the no-fault act that was rejected by referendum in 1994. The majority reaches its result by erroneously removing the determination of which expenses are “reasonably necessary” from the jury. Additionally, the majority’s new judicially crafted definition of “reasonably necessary” elevates the standard for proving that treatment is “reasonably necessary” to one that is more stringent than MCL 500.3107(1)(a) requires. I would apply the no-fault act as written, I would uphold the jury’s finding in this case that the procedure performed on plaintiff was “reasonably necessary,” and I would hold that plaintiff is entitled to reimbursement of the costs associated with the procedure. Accordingly, I dissent.
CAVANAGH (except for footnote 20) and MARILYN KELLY, JJ., concurred with HATHAWAY, J.

 MCL 500.3107(1)(a).

 Krohn v Home-Owners Ins Co, unpublished opinion per curiam of the Court of Appeals, issued January 26, 2010 (Docket No. 283862), p 6.

 Defendant also argues that the treatment was not “lawfully rendered” under MCL 500.3157 of the no-fault act because the procedure performed on plaintiff in Portugal has not been approved in the United States by the FDA. MCL 500.3157 provides in pertinent part that “[a] physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance ... may charge a reasonable amount for the products, services and accommodations rendered.”
In this case, I believe that the procedure was likely “lawfully rendered” because it was lawful in Portugal, where it was performed. Therefore, I find persuasive the Court of Appeals dissent’s conclusion that adopting defendant’s position would require that the statute would have to “be rewritten to provide coverage for treatment ‘lawfully rendered in the U.S. and approved by the FDA.’ ” Krohn, unpub op at 10 (Fort Hood, J., dissenting). Because the Legislature did not incorporate such language into the statute, it appears that the procedure was “lawfully rendered” under MCL 500.3157 because it was lawful in Portugal. However, because the majority does not opine on this argument, I do not find it necessary to consider this argument in detail in this dissent.

 Potter v McLeary, 484 Mich 397, 410; 774 NW2d 1 (2009), citing Sun Valley Foods Co v Ward, 460 Mich 230, 236; 596 NW2d 119 (1999).

 Id.

 Sun Valley, 460 Mich at 236.

 People v McGraw, 484 Mich 120, 126; 771 NW2d 655 (2009), citing Baker v Gen Motors Corp, 409 Mich 639, 665; 297 NW2d 387 (1980).

 Kirkaldy v Rim, 478 Mich 581, 587; 734 NW2d 201 (2007) (Cavanagh, J., concurring).

 See Sun Valley, 460 Mich at 237.

 Herman v Berrien Co, 481 Mich 352, 366; 750 NW2d 570 (2008).

 Turner v Auto Club Ins Ass’n, 448 Mich 22, 28; 528 NW2d 681 (1995), citing Gobler v Auto-Owners Ins Co, 428 Mich 51, 61; 404 NW2d 199 (1987).

 Ante at 148.

 Ante at 170.

 Ante at 168.

 This case involves defendant’s motion for a directed verdict. “The standard of review for judgments notwithstanding the verdict requires review of the evidence and all legitimate inferences in the light most favorable to the nonmoving party.” Orzel v Scott Drug Co, 449 Mach 550, 557; 537 NW2d 208 (1995), citing Wadsworth v New York Life Ins, 349 Mich 240; 84 NW2d 513 (1957).

 Owens held that the presentation of competing professional opinions from doctors who assessed the plaintiff is enough to create a question of fact regarding whether the procedure was “reasonably necessary.” Owens, 444 Mich at 326.

 While the majority acknowledges that Dr. Lima testified that he “would say the majority of patients showed some improvement,” the majority mischaracterizes this testimony as a “guess” that “hardly demonstrates that a ‘majority of patients showed improvement.’ ” Ante at 153 n 5. However, as the actual testimony illustrates, the majority’s characterization of these facts is not supported by the record. Further, the jury apparently disagreed with the majority’s characterization of Dr. Lima’s statements.

 Ante at 170.

 “Reasonable” is defined as “1. Capable of reasoning; rational. 2. Governed by or in accordance with reason or sound thinking. 3. Within the bounds of common sensei.]” The American Heritage Dictionary of the English Language, New College Edition (1981) (emphasis added). “Necessary” is defined as “1. Needed for the continuing existence or function *187 ing of something; essential; indispensible .... 2. Needed to achieve a certain result or effect, requisite: the necessary tools.” Id. (emphasis added). When the two terms are read together, “reasonably necessary” indicates something that is essential and proper under the circumstances.
The majority rejects my analysis, claiming that it offers no legal standard for determining whether a procedure is “reasonably necessary” under MCL 500.3107(l)(a). However, as remains clear throughout my analysis, this dissent merely applies our rules of statutory interpretation, which require that these words be given their common meaning when the statute does not provide a technical definition for them. MCL 8.3a. Thus, the majority’s accusation is devoid of merit, given that I conclude that the determination should be based on the commonly understood meaning of the words “reasonable” and “necessary,” rather than injecting a statutorily unsupported requirement that the procedure be “medically” reasonably necessary.
Thus, I would hold that, as used in MCL 500.3107(1)(a), a procedure is “reasonably necessary” if a reasonable person would conclude that the procedure is a “necessary” tool for the “injured person’s care, recovery, or rehabilitation.” And, as discussed in this dissent, in most cases a jury is in the best position to apply the common sense necessary to make this determination, and can make that determination using a number of factors. It is clear that applying the commonly understood meaning of the statutory phrase “reasonably necessary” is more consistent with the legislative intent and does provide ample guidance to parties and courts.

 Turning the “reasonably necessary” standard into one that requires objective and verifiable proof of efficacy may prove troubling for this Court in future cases, considering that the “reasonably necessary” standard appears in more than 100 Michigan statutes, our court rules, and the Michigan Rules of Professional Conduct. For example, will the majority’s new standard for “reasonably necessary” apply in cases *188 regarding revenue sharing, MCL 141.913b(3), regional convention facilities, MCL 141.1369(10)(d), the tender of goods, MCL 440.2503(1)(a), funds transfers, MCL 440.4802(1)(b), dealer agreements with auto manufacturers, MCL 445.1575(2), nonprofit corporations, MCL 450.2443(2)(c), churches, MCL 458.257, cooperative savings associations, MCL 491.314, airport facilities, MCL 259.118(3)(c), farm produce fees, MCL 285.321(5), the competence of a criminal defendant, MCL 330.2020(1), water and sewer board decisions, MCL 333.12713(2), the application of the rules of evidence, MRE 803(4), and attorney misconduct, MRPC 1.6(c)(3)?

 The majority disregards the testimony concerning the success of other patients in Dr. Lima’s clinical program. As noted, the majority states that “[w]hatever research he may have conducted, it was unsupported by any controlled studies, it had not been subjected to peer review, and the medical evidence had not been debated in scholarly publications.” Ante at 170. Thus, under the majority’s test requiring evidence proving the efficacy of the procedure, the standard is a heightened standard that cannot be met with a minimal threshold of supporting evidence, even when there is no evidence presented disproving the effectiveness of the procedure.

 See Griffith v State Farm Mut Auto Ins Co, 472 Mich 521, 548; 697 NW2d 895 (2005) (Marilyn Kelly, J., dissenting) (“Given the wide variety of circumstances under which injured parties seek no-fault benefits, the act provides for wide latitude in determining what benefits are reasonably necessary in a given situation.”).

 Ante at 158-159.

 Citation and quotation marks omitted. Nasser instructed courts that unless it can be said “with certainty” that an expense was or was not “reasonably necessary,” it is inappropriate to decide that issue as a matter of law. In other words, Nasser clearly stands for the proposition that only in rare cases will this issue be decided as a matter of law. Thus, the majority’s efforts to “expound upon the phrase ‘reasonably necessary’ ” in order to purportedly “provide essential legal guidance,” are unnecessary. Rather than being “entirely consistent with” and “providing further guidance along” the lines of Nasser, the majority opinion borders on overruling it.
*191 Instead of taking the majority’s approach, I would adhere to precedent and leave what is generally a question of fact to the jury, where it properly belongs. In holding otherwise, the majority usurps the role of the Legislature and the jury.

 The Legislature enacted 1993 PA 143, and Governor John Engler signed it into law on August 6, 1993. The bill was set to go into effect on April 1,1994. Before April 1, however, a petition for referendum was filed containing the required number of valid signatures to place the referendum on the ballot. When the petition was filed, 1993 PA 143 was suspended for the referendum vote. Farm Bureau Mut Ins Co of Mich v Ins Comm’r, 204 Mich App 361; 514 NW2d 547 (1994).

 60.85 percent voted to reject the enactment of 1993 PA 143. 39.15 percent voted to accept the enactment. See Michigan Manual 1995-1996, p 955.

 Proposal C was not the first time the voters rejected attempts by the Legislature to change the mandates of the no-fault act. In November 1992, the Legislature placed a proposal on the ballot, by initiative petition, that would, among other changes to the no-fault act, have placed certain caps on no-fault benefits. Proposal D of 1992 was also soundly rejected, with 62.6 percent of voters voting against the initiative and 37.4 percent of voters voting for the initiative. See Michigan Manual 1993-1994, p 878. Because the voters have said “No” to the only two attempts by the Legislature to reform the no-fault act, it is clear that the majority of voters want the no-fault act the way it is, without changes.

 The majority attempts to bolster this argument by citing the Court of Appeals’ opinion in Michigan Chiropractic Council v Office of Fin & Ins Seros Comm’r, 262 Mich App 228; 685 NW2d 428 (2004), vacated 475 Mich 363 (2006). However, this Court vacated that opinion for lack of justiciability, meaning that the issues in the case were improperly before the Court. Accordingly, I do not find the majority’s citation persuasive.

 The majority mischaracterizes my opinion, claiming that I believe that “Michigan voters intended its courts to rubber-stamp all determinations under the no-fault act....” Ante at 176-177. This is a gross overstatement of my much narrower point. The point of my argument is that the voters’ rejection of 1993 PA 143, which contained essentially the same standard that the majority adopts today, indicates both that the voters did not want to adopt a “medically appropriate” standard and that, by inference, “reasonably necessary” is a lower standard than “medically appropriate.”

 Const 1963, art 1, § 14.